COMMONWEALTH *vs.* HOWARD T. WINTER
(and three companion cases[1]).

Middlesex.  October 19, 1979. — April 7, 1980.

Present: GOODMAN, ROSE, & KASS, JJ.

*Conspiracy.  Constitutional Law,* Double jeopardy.  *Practice, Criminal,* Duplicitous convictions, Conduct of prosecutor, Argument by prosecutor.  *Evidence,* Relevancy, Spontaneous utterance, Acts and declarations of conspirator.

Upon conviction of a defendant on two indictments, each charging the defendant with conspiracy to violate G. L. c. 265, § 25, the judge erred in imposing consecutive sentences where both conspiracies were alleged to have continued during the same period of time, to have involved the same people, and to have had a single purpose. [522-528]

---

[1] One companion case is against Howard T. Winter and two are against Salvatore Sperlinga.  Winter also appeals from an order of a single justice of this court denying a stay of execution of the defendant's sentences.  This appeal was heard together with the other two.

At the trial of a defendant charged with conspiracy to threaten an injury in violation of G. L. c. 265, § 25, the judge did not err in permitting the victims to testify as to their fear upon being threatened. [528]

At the trial of a defendant charged with conspiracy to threaten an injury in violation of G. L. c. 265, § 25, the judge did not err in permitting a witness to testify as to what one of the victims had said to him about thirty seconds after the defendant had left the victim. [528]

At the trial of a defendant charged with conspiracy to threaten an injury in violation of G. L. c. 265, § 25, the judge did not err in denying the defendant's motions to strike the testimony of a Treasury agent as to his conversations with a coconspirator where the jury could have found that the coconspirator's responses were made to further the purpose of the conspiracy. [528-530]

At the trial of a defendant charged with conspiracy to threaten an injury in violation of G. L. c. 265, § 25, the alleged purpose of which was to place the defendant's pinball machines in certain clubs, there was no merit to the defendant's contention that the judge erred in admitting in evidence an entire conversation between a codefendant and a witness who had been asked to act as an intermediary. [530]

At the trial of a defendant charged with conspiracy to threaten an injury in violation of G. L. c. 265, § 25, the judge did not err in refusing to grant a mistrial when a witness replied in the affirmative to the prosecutor's question whether the witness was receiving protection. [530-531]

At a criminal trial, the judge did not abuse his discretion in choosing to strike an improper question by the prosecutor rather than to declare a mistrial. [531-532]

In the circumstances, a mistrial was not required on account of a prosecutor's alleged misconduct in persisting in lines of inquiry from which the judge had excluded him. [532]

A prosecutor's closing argument, read as a whole, was not so prejudicial to a defendant as to require a new trial. [532-533]·

INDICTMENTS found and returned in the Superior Court on October 20, 1977.

The cases were tried before *Garrity, J.*

A petition for stay of execution, filed in the Appeals Court, was heard by *Brown, J.*

*Albert F. Cullen, Jr. (Regina L. Quinlan* with him) for the defendants.

*Carol S. Ball & William L. Pardee,* Assistant District Attorneys, for the Commonwealth.

GOODMAN, J.   The defendant Howard T. Winter appeals from convictions on two indictments, each charging that "between the first day of August [1977] . . . and the thirtieth day of September [1977]" he conspired with one Salvatore Sperlinga and one Herbert T. Foster, Sr. to "threaten an injury to the person or property of another by a verbal communication with intent thereby to extort . . . a pecuniary advantage, or with intent to compel said person to do an act against his will."   See G. L. c. 265, § 25.   The answer to the defendant's motions for particulars alleges as to both indictments that "[t]o the best of the Commonwealth's knowledge this offense began on or about the first day of August, 1977, and continued through the thirtieth day of September, 1977."   The particulars further allege that "[t]he manner and means by which th[e] crime [charged in one of the indictments] was committed were that Howard Winters, Salvatore Sperlinga and Herbert Foster conspired between and among each other to maliciously threaten an injury to Austin Griffin, and/or to the property of said Griffin, and his employer, the Disabled American Veteran's Club [DAV]" and that "[t]he manner and means by which th[e] crime [charged in the other indictment] was committed were that Howard Winters, Salvatore Sperlinga, and Herbert Foster conspired . . . to maliciously threaten an injury to Arthur Agostinelli, Sr. and/or to the property of said Agostinelli, and his employer, Somerset Vending Company [Somerset]."[2]   These indictments were tried with two indictments against Sperlinga and two indictments against Foster, all making the same charges.   Sperlinga was also

---

[2] These two indictments, as supplemented by the particulars, were treated by all parties and the court as though they charged directly separate conspiracies, one to threaten Griffin and the DAV with intent to extort or compel an act against the victim's will and the other to threaten Agostinelli and Somerset.   We therefore likewise treat these indictments as charging such separate conspiracies — albeit in a clumsy and roundabout way.   See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 226 (1971).   This construction of the charges by the parties may be more favorable to the prosecution than it deserves in view of the possible interpretations which suggest themselves.

convicted on both indictments and appealed; Foster was acquitted.[3] After the oral argument of the Winter and Sperlinga appeals, Sperlinga died, and the two indictments against him are to be dismissed in the Superior Court. See *Commonwealth* v. *Harris*, 379 Mass. 917 (1980).

The evidence marshalled by the prosecution included testimony by Griffin, an officer of the DAV, Agostinelli, who had an interest in and was employed by Somerset, and one Robinson, engaged in the business of manufacturing and distributing coin operated machines, who testified to conversations with Foster and a meeting with Winter, Sperlinga and Foster. The Commonwealth's case also included testimony by one DelVendo, a special agent with the Bureau of Alcohol, Tobacco and Firearms of the United States Treasury Department and a member of the DAV, about conversations with Sperlinga and testimony by one Percy Sylvester, an officer of Somerset.

Griffin testified that on September 21, 1977, about 10:00 to 10:30 A.M., he was at the DAV post[4] when two men, who were strangers to him and whom he identified at trial as Winter and Sperlinga, rang the doorbell; he let them in. From the prosecuting attorney's questioning the jury could have reconstructed the following scenario:

WINTER (in a "louder than normal" voice as he and Sperlinga entered the premises): "Who runs this place?"
GRIFFIN: "I do."
WINTER: "Do you know who I am?"
GRIFFIN: "No."
WINTER: "I'm Howie Winters. It cost me a bundle of money to make these machines legal,[5]

---

[3] Three other indictments charging them with similar conspiracies against one Bellini and his employer, the Moose Lodge, were dismissed during trial.

[4] The post opens at noon; Griffin, who is retired, generally arrived there at about 9:00 in the morning, got it ready for business and was available to members who might require help with their various problems.

[5] Winter was referring to an ordinance adopted on July 28, 1977, by the board of aldermen of Somerville over the mayor's veto entitled, "An Ordi-

and I'm going to get it back. Those machines[6] are going out and mine are coming in."

GRIFFIN:      "We own those machines, we have owned them for years. We pay a Federal tax on them of $1000 a year. We spent money on those machines . . . Those are our own machines. What are you going to do about it?"

Griffin further testified that he then went on to tell Winter how much the machines were worth and Winter said, "We'll take care of that." Griffin also testified that: "I then said to him that a decision like this I couldn't make myself. I wanted to have two weeks to get the executive board together to talk it over." He further testified: "That was Wednesday. I said, 'Give me a week.'"

WINTER:       "I'll give you till Friday. Get them down here."

GRIFFIN:      "We'll probably close the building up."

Winter and Sperlinga left about 11:00 A.M. Griffin testified, over objection and exception, that he was "scared blue" — an old fashioned expression which he explained as meaning "frightened and nervous" — and that "[m]entally, I haven't had a good night's sleep since this thing." At about noon, Griffin spoke to the treasurer of the DAV and thereafter phoned the members of the executive committee, eleven or twelve in number, for an emergency meeting the next evening.

The same day at about 2:30 P.M., Winter and Sperlinga visited Somerset, which places and services coin operated machines in clubs and other establishments with which it shares the proceeds.[7] There they spoke with Agostinelli.

nance authorizing the granting of licenses for certain coin operated automatic amusement devices and providing for the regulation thereof."

[6] From the evidence it was inferable that Winter was referring to coin operated machines of various kinds on the DAV premises.

[7] Such companies are referred to as "operators"; the premises on which the machines are placed are referred to as "locations."

The scenario which the jury could have reconstructed was as follows:

SPERLINGA (as the door was opened to let Winter and him in): "Hi, we're looking for Gus."

AGOSTINELLI: "I'm Gus."

SPERLINGA: "Hi, I'm Sal [mentioning his last name which Agostinelli did not completely catch]. This is Howie Winters. We'd like to talk to you. Is there some place we can go and talk?"

AGOSTINELLI: "Yes, come in, in the back room. We can talk there."[8]

SPERLINGA: "You know why we are here."

AGOSTINELLI: "No, I don't know why you're here."

SPERLINGA: "You must have an idea why we're here."

AGOSTINELLI: "No, I don't."

WINTER: "You have been operating in this city long enough. It cost me a bundle to get these licenses passed. I'll give you two days to get your machines out of the city, or you'll be sorry."

AGOSTINELLI: "Well, I thought when you were getting licenses passed through the city, that . . . you wanted to just put them in the barrooms."

WINTER: "This is not for barrooms, only. This is for the whole city. I own this city. This is my city. You're all done now. You have two . . . alternatives. Either put a reasonable price on the machines and we'll buy them, or take them out and we'll install our own. If you don't, we'll send someone down to collect back dues for all the years you have been operating in Somerville. And if you don't [pay], you'll be sorry."

AGOSTINELLI: "You mean to say you can come in and tell someone that he's out of business?"

---

[8] They went into the back room where Agostinelli sat and the other two stood over him.

WINTER:         "As far as Somerville is concerned, you're out of business. You're all done. This is my city. I own it. We'll be back on Saturday to see you to find out what you're going to do."

AGOSTINELLI: "I'll not be here Saturday. My wife and I are going away for the weekend, and we won't be back until Monday."

WINTER:         "Well, we'll be in to see you Monday."

Agostinelli testified that during much of the conversation Winter "was actually yelling at me" and "shaking his finger right at my nose." Agostinelli testified, over objection and exception, that he felt "like I was going to die or collapse," his "stomach was turning inside out," and his "head started to spin." He "didn't know what was going on or what was going to happen." At the end of the conversation he let Winter and Sperlinga out, went back to his desk, lit a cigarette and shook his head. He then went into Sylvester's office "shaking like a leaf." His voice was "[k]ind of shaky" and he was "panting." After talking to Sylvester for about ten or fifteen minutes, he returned to his desk and sat "[w]ith my feet under the desk and in a prone position, trying to relax, which I couldn't do."

This testimony was corroborated by that of Percy Sylvester, whose office adjoined the room in which the meeting among Agostinelli, Winter and Sperlinga had taken place. Sylvester testified, over objection and exception, that after the meeting Agostinelli came into his office and leaned against the door frame. It could have been found that this was about thirty seconds after Agostinelli had let Winter and Sperlinga out of the premises. Sylvester testified that the following took place: "He [Agostinelli] said, 'Did you hear what those two guys says to me?' I says, 'No, what guys?' And he names them, 'Winters,' and it was Sperlinder [sic] or whatever. I said, 'Well, what?' And he says, 'Well, he says if we don't get out of the business, they're going to break my legs, they're going to do other things.' I said, 'Forget it and go back to work.'" Sylvester testified that "he looked shook up to me, or nervous." He amplified

this: "Well, it's hard to explain to another individual. A fellow says you've got cancer, how would you feel? About the same thing."

Robinson testified that in mid August, 1977, as a result of a telephone call from Foster, whom he had not previously known, he went to Foster's place of business in Somerville, which contained about fifty new coin operated machines. Foster told him, "[W]e are taking over the city"; and when Robinson asked, "Who's taking over the city," Foster replied, "Howie." Foster said, as put by Robinson, "that Howie was ranting and raving and he wanted the machines installed in all the barrooms, in all the clubs in the city. And he wanted to do it immediately." Robinson replied, "So what." Robinson further testified that "Mr. Foster wanted me to relay the message to all the other operators to get out of the city, that they were taking over the whole city." Robinson then told Foster that he was going to see Sylvester and would relay his message. Foster also said, as reported by Robinson, that "he had a meeting on Wednesday[9] at Winter Hill and he had to give Howie and Sal an answer." The meeting then ended, and Robinson went to see Sylvester.

In the first week in September, as a result of a call from Foster, Robinson, Foster, Winter and Sperlinga met in Chelsea. According to Robinson, Winter began the conversation: "We're taking over the machines, all the machines in the city. We'll offer you a price for your machines as they stand on location, the way they are now." Robinson further testified that "Mr. Winters said, in a loud voice, 'You're all done in this city. I own this city. I'm taking it over and you're also going to back out of all the clubs.' And he said, . . . 'This is my city and if this doesn't happen, I'm going to charge you back for all the time you and all the others have been in the city.'" Robinson laughed and said, "Yes, well, how much are you going to charge Mr. Sylvester

---

[9] The conversation between Robinson and Foster took place on the preceding Monday or Tuesday.

for the length of time he has been in the city?" Robinson also testified that at one point in the conversation Winter "said he would get rough on me and the rest of us if we didn't back out of all the clubs in the city. And he said he could be plenty rough. . . . He said we're all done in this city and we're to get out, get out of all the clubs. He would put his own 'machines in the clubs." When Robinson pointed out that he was the only one in the country who was manufacturing a certain machine, Foster reached over and spoke to Winter; "with that Mr. Winters cooled down." Winter then said, "Well, maybe I came on a little strong." Robinson replied, "All right. I'll relate your message to the rest of them." The meeting thereupon broke up. After the meeting Robinson again went to see Sylvester.

Subsequently, about the middle of September, Foster again telephoned Robinson, and Robinson went to Foster's place of business in Somerville. Robinson testified that "Mr. Foster said that Mr. Winter was hot, ranting and raving. He wanted him to take over all the clubs." Foster complained that "he couldn't handle the barrooms and pinballs in the barrooms, let alone the clubs." Foster said that "he was caught in the middle and he didn't know how to get out of it." Robinson responded, "Well, you're going to wind up in front of the grand jury. . . . [Y]ou're going to find yourself in a bind, just like Bobby Martinez." Foster again said that "he knew, but he didn't know how to get out of it." Foster said that Winter "wanted no back-talk . . . . He wanted an answer . . . and he wanted it immediately."[10] Robinson then said that he was going to see Sylvester. Foster said "to tell Mr. Sylvester that he had to back out of all the clubs in the city, too." Robinson replied, "I'll relay your message." After the meeting Robinson again went to see Sylvester.

---

[10]On cross-examination Robinson testified that Foster "said Mr. Winters was hot and he wanted an answer and he wanted everything taken over in the City of Somerville. He wanted it, he wanted us muscled out and he wanted it done immediately." The reference was to "all the operators in the city."

Winter testified in his own behalf that on September 21, 1977, he and Sperlinga did, indeed, visit both the DAV and Somerset in an endeavor to help Foster find locations for his pinball machines. He testified that one day in the middle of August, he and Sperlinga were in a diner when Foster came in. They invited Foster to sit down with them. In the course of a conversation Foster asked whether he and Sperlinga "could give him a hand to get some locations around the city."[11] They both said that they "would try to get him some locations to place his pinball machines." That was the end of the conversation. Winter did nothing about the matter until September 21. That morning he again saw Sperlinga at the diner and asked him if he had done anything about getting locations for Foster's pinball machines. Sperlinga said that he had spoken to several barroom owners. Winter suggested that they visit some of the clubs — the fraternal organizations in the city — and "then we decided to go to a few of the clubs and see what we could do." They then went to the DAV which was "[t]he nearest one to where we were at . . . ." There they spoke to Griffin. Winter's version of the meeting with Griffin varied considerably from that given by Griffin. They then went to Post 388 of the American Legion, but the person in charge of the machines was not there. Next they went to the Moose Lodge, where the bartender told him that the person in authority was not there. The bartender then suggested that they should "see a guy by the name of Gus at National Music Company. He seemed to have all the machines in all these clubs." They then left and had lunch. After lunch they went looking for the National Music Company, which they finally found (its name had been changed to Somerset), and spoke to Agostinelli. Again, Winter's version of the meeting differed from that given by Agostinelli. He and Sperlinga then parted. Winter denied any meeting with Robinson.

[11] On cross-examination the prosecutor elicited that Foster had told Winter and Sperlinga that if they could get some locations they could make some money. Winter denied that there had been any agreement, but admitted that they had discussed a sixty/forty cut.

Winter was sentenced to nine to ten years on each of the two indictments, the sentences to run consecutively. He contends that this was double punishment in violation of his rights under the double jeopardy clause of the Fifth Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment. He also raises various evidentiary issues and asserts prosecutorial misconduct. We agree with the defendant's contention that the imposition of consecutive sentences in this case was error; we reject his other contentions.

1. *Double jeopardy.* In *Brown* v. *Ohio,* 432 U.S. 161, 165 (1977), the Supreme Court of the United States described the function of the double jeopardy clause applicable in this case: "Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." See *North Carolina* v. *Pearce,* 395 U.S. 711, 717 (1969). The double jeopardy clause is not implicated in the prosecutor's choice of charges in a single prosecution which has no relation to any previous prosecution. Such a choice is constrained by other considerations — the rules affecting joinder (see now Mass. R. Crim. P. 9, 378 Mass. 859 [1979]) and the practical availability of proof, adequate to avoid a fatal variance. See *United States* v. *Honneus,* 508 F.2d 566, 570 (1st Cir. 1974).

In this case, the defendant does not argue any question relative to the indictments (see n. 2) or relative to the submission of both charges to the jury. We do not intimate that any such contentions would have availed the defendant. On the evidence, the jury could have inferred a conspiracy to threaten the DAV in view of the concerted action by Sperlinga and Winter at the DAV, and they could likewise have inferred a conspiracy to threaten Somerset in view of the concerted action at Somerset. *Commonwealth* v. *Stasiun,* 349 Mass. 38, 41, 50-51 (1965). See *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 494 (1921). There was no charge of a single conspiracy embracing the separately al-

leged instances of concert reflected in the two incidents on September 21, 1977 (see n. 2). And the jury were thus properly instructed that they could not find guilt on the basis of a "generalized conspiracy" but only if they were "satisfied that there were two specific conspiracies." The judge further instructed the jury: "If the government shows, for example, that defendant X in this case was conspiring . . . in a general way, that's not enough to show that he conspired in the particular way with respect . . . to the DAV conspiracy and the Somerset Vending conspiracy." See *Commonwealth* v. *Benjamin,* 3 Mass. App. Ct. 604, 619 (1975), in which we approved the submission to the jury of multiple and overlapping charges of conspiracy where no over-all conspiracy was charged. See also the prior opinion in the same case by the Supreme Judicial Court, *Commonwealth* v. *Benjamin,* 358 Mass. 672, 675 (1971), refusing to dismiss an indictment then containing one hundred twenty-two separate counts of conspiracy, though they set forth "what could reasonably be viewed as a single conspiracy (or perhaps only a few conspiracies)." The court, while disapproving the dismissal of the indictments by the Superior Court, left it to the lower court to require such simplification as might be appropriate.[12]

---

[12] We emphasize the disapproval by the Supreme Judicial Court of the practice of charging a number of subconspiracies although a single conspiracy indictment would be more suitable. The court said, "Our holding that the dismissal of the indictments was not proper should not be regarded as approval of the practice of obtaining multiple, repetitious, and overlapping indictments (or counts in indictments) where fewer indictments or counts not only would suffice, but probably would much more clearly present the charges. Multiple indictments, such as those in the present cases, impose an unnecessary burden on courts, juries, and parties. They cause unnecessary expense and confusion, and may lead to unduly long trials. We regard the practice as objectionable. Where new indictments, more simply framed, may still be obtained within the period of the applicable statute of limitations, we think the trial judge may and should require a district attorney to attempt to obtain them." *Commonwealth* v. *Benjamin,* 358 Mass. at 677-678.

As we have intimated above (citing *United States* v. *Honneus,* 508 F.2d 566, 570 [1st Cir. 1974]), there may be circumstances in which the practicalities call for charging a number of subsidiary conspiracies, rather than an over-all conspiracy.

Contrast *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 371-372 (1971), in which a single conspiracy was charged, and the judge properly submitted the question whether there was a single conspiracy or multiple conspiracies to the jury.

Once the trial judge received the verdicts, his task in the first instance, ordinarily routine, was to determine the parameters set in the applicable statute (G. L. c. 274, § 7), so that he could sentence within those parameters. That statute provides a maximum sentence of ten years for conspiracy to violate G. L. c. 265, § 25, of which conspiracy, as we construe the charges (n.2), the defendant was found guilty.[13]  That maximum is applicable to "the crime of conspiracy"; and the "unit of criminal offense" (*United States* v. *Universal C.I.T. Credit Corp.*, 344 U.S. 218, 223 [1952]) is thus the conspiracy.  We see no authority in the statute to fragment a conspiracy so that double punishment results. See *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-309 (1972).  The statute contemplates the possibility of "any means" with a single purpose and a single punishment determined on the basis of the highest penalty applicable to the felonious purpose or any of the felonious means (see n.13). An interpretation permitting fragmentation which results in punishment beyond the stated maximum is not lightly to be inferred.  The question of cumulative punishments when a single statute is involved has generally been resolved "in favor of lenity." *Heflin* v. *United States*, 358 U.S. 415, 419 (1959).  See Note, Twice in Jeopardy, 75 Yale L.J. 262, 313-316.  Compare *Lewis* v. *Commonwealth*, 329 Mass. 445, 448-449 (1952); *Brown* v. *Commissioner of Correction*, 336 Mass. 718, 721 (1958) — cases in which the Supreme Judicial Court opted for an interpretation yielding the more

---

[13] General Laws c. 265, § 25, provides a maximum penalty of fifteen years.  General Laws c. 274, § 7, Second, sets a maximum sentence of ten years for "the crime of conspiracy" where "the purpose of the conspiracy or any of the means for achieving the purpose of the conspiracy" is a felony such as G. L. c. 265, § 25.

humane result. But see *Commonwealth* v. *Guerro,* 357 Mass. 741, 751 (1970).

The defendant argues that the record in this case shows only a single conspiracy for which multiple punishments are not authorized. We agree. Indeed, the Commonwealth concedes in its brief that the purpose of the conspiracy was "to place pinball machines in locations in Somerville." It argues, however, (in its brief) that the "crime of conspiracy consists in the agreement" and that here "a single broad purpose [wa]s sought to be achieved by separate criminal agreements." As far back as *Commonwealth* v. *Rogers,* 181 Mass. 184, 191 (1902), Justice Holmes characterized a similar argument as "an odd perversion of the principle that the offence of conspiracy is committed as soon as the combination or agreement is made." In that case the court held that it was of no consequence that the conspiracy was general at its inception but "was enlarged with each new item that entered into the plan while it still was on foot . . . ." The prosecution misses the point that — while a conspiracy, like a partnership, requires an agreement — the conspiracy is no more the mere agreement than the partnership agreement is the partnership. See Developments in the Law — Criminal Conspiracy, 72 Harv. L. Rev. 920, 988-989 (1959). The conspiracy includes the continuous combination, the "cooperative design," which the agreement engenders. *Commonwealth* v. *Dyer,* 243 Mass. 472, 485 (1922). *Attorney Gen.* v. *Tufts,* 239 Mass. at 493. "[T]he unlawful agreement satisfies the definition of the crime, but it does not exhaust it." *United States* v. *Kissel,* 218 U.S. 601, 607 (1910), quoted in *Commonwealth* v. *Beal,* 314 Mass. 210, 255 (1943). The prosecution is thus not aided by its argument that the record permits an inference that an original agreement was made to put pinball machines in Somerville by threatening the operators which was supplemented by an agreement to threaten the clubs directly.[14] We see nothing

---

[14] We note that this justification for charging two conspiracies was not articulated either in the pleadings or at trial. See n.2.

here but a change in tactics and means to effectuate the single continuing purpose of the combination. To be sure the change in tactics may well have called for further consultations and concurrences, but they were still "embrace[d]" in the overriding purpose of the continuing combination. *Braverman* v. *United States*, 317 U.S. 49, 53-54 (1942). *Blumenthal* v. *United States*, 332 U.S. 539, 557-559 (1947). "Because one conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives. . . . If each stitch in that web were treated as a separate conspiracy, infinite bases for liability could be confected . . . ." *United States* v. *Rodriguez*, 585 F.2d 1234, 1250 (5th Cir.), reh. granted, 585 F.2d 1251 (1978). Here, both conspiracies were alleged to have continued during the same period of time; the same people were involved, and a single purpose informed the DAV incident and the Somerset incident, both of which occurred on the same day and neither of which can be understood isolated from the other. *Miller* v. *United States*, 4 F.2d 228, 230-231 (7th Cir. 1925). *United States* v. *Mazzochi*, 75 F.2d 497, 497-498 (2d Cir. 1935). *United States* v. *Anderson*, 101 F.2d 325, 333 (7th Cir. 1939). *United States* v. *Mori*, 444 F.2d 240, 242-245 (5th Cir. 1971). *Natarelli* v. *United States*, 516 F.2d 149, 152 (2d Cir. 1975). Contrast *United States* v. *Varelli*, 407 F.2d 735, 742-743 (7th Cir. 1969). Compare *United States* v. *Honneus*, 508 F.2d at 569-570; *United States* v. *Adcock*, 487 F.2d 637, 639-640 (6th Cir. 1973), holding as a matter of statutory construction that cumulative punishments may not be imposed at a single trial on charges of violations of various conspiracy statutes where these conspiracies were part of a single conspiracy.[15] Developments in the Law — Criminal Conspiracy, 72 Harv. L. Rev. 920, 930 (1959). The coup de grace to the prosecutor's argument is found in *United States* v. *Kissel*, 218 U.S. at 607, in which Holmes, J.,

---

[15] For a discussion of the differing views of the Courts of Appeals see *United States* v. *Rodriguez*, 585 F.2d at 1247-1251.

said: "But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, and there is such continuous cooperation, it is a perversion of natural thought and of natural language to call such continuous cooperation a cinematographic series of distinct conspiracies, rather than to call it a single one."

From the statute (G. L. c. 274, § 7), as we have construed it, and our examination of the record in this case, and applying Federal standards (*Ashe* v. *Swenson,* 397 U.S. 436, 450 [1970] [Brennan, J., concurring]), we conclude that double punishment was imposed for the "same offense," in violation of the double jeopardy clause of the United States Constitution. The record manifests that punishment was here imposed for each of two fragments "within a larger, unified conspiracy." *United States* v. *Ruigomez,* 576 F.2d 1149, 1151 (5th Cir. 1978). See *United States* v. *Mallah,* 503 F.2d 971, 985 (2d Cir. 1974); *United States* v. *Young,* 503 F.2d 1072, 1075 (3d Cir. 1974); *United States* v. *Tercero,* 580 F.2d 312, 314-315 (8th Cir. 1978).[16] The teaching of *Brown* v. *Ohio,* 432 U.S. at 169, and of *Sanabria* v. *United States,* 437 U.S. 54, 69-72 (1978), is that, where a statute punishes a continuing offense, prosecutors cannot "avoid its [the constitutional] limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Brown* at 169. See *In re Snow,* 120 U.S.

---

[16] We note that these cases all rejected arguments by the prosecution based on the "same evidence" rule. It has no application here since a single statute is involved and the issue is whether two discrete offenses were proved under that statute rather than a single continuing offense. *Sanabria* v. *United States,* 437 U.S. at 70 n.24. "Since the single continuing agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes." *Braverman* v. *United States,* 317 U.S. 49, 54 (1942), citing *Blockburger* v. *United States,* 284 U.S. 299, 301-304 (1932), and *Albrecht* v. *United States,* 273 U.S. 1, 11-12 (1927). Contrast *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. at 220, in which different conspiracies with different purposes were tried separately.

274, 286 (1887), in which the Supreme Court refused to follow *Commonwealth* v. *Conners,* 116 Mass. 35, 36 (1874).

2. *Evidentiary matters.* (a) Testimony about the fear felt by Griffin and Agostinelli at their encounters with Winter and Sperlinga was relevant. *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 816 (1973), holding that apprehension goes to the proof of a violation of G. L. c. 275, §§ 2-4 (threat to commit crime). The victims' fear confirms the capacity of the threats to create apprehension and is thus probative of the defendants' intent to intimidate. *State* v. *Schweppe,* 306 Minn. 395, 401 (1975). It is a significant circumstance coloring the encounters as a whole. *Commonwealth* v. *De Vincent,* 358 Mass. 592, 595 (1971). The holding in that case that "the state of mind of the person threatened is not controlling" does not imply that such state of mind does not have probative value. *United States* v. *Compagna,* 146 F.2d 524, 528-529 (2d Cir. 1945).

(b) We cannot say that the trial judge exercised his discretion improperly in admitting in evidence Sylvester's testimony of what Agostinelli, "shaking like a leaf," said as he entered Sylvester's office about thirty seconds after Winter and Sperlinga left. The cases applicable to the admissibility of excited utterances are cited and the principle is stated in *Blake* v. *Springfield St. Ry. Co.,* 6 Mass. App. Ct. 553, 556-557 (1978). We there said: "Presently a statement is admissible if its utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize and explain the underlying event. The statement need not have been strictly contemporaneous with the event. . . . The trial judge is given broad discretion in determining whether such a statement is admissible." See *Commonwealth* v. *Sellon,* 380 Mass. 220, 229-230 (1980).

(c) The judge did not err in denying the defendant's motions to strike DelVendo's conversations with Sperlinga, the first on the evening of September 21, 1977, the day Griffin had been threatened, and the second two days later in the afternoon of September 23.

On the evening of September 21 DelVendo sought out Sperlinga, with whom he was acquainted and who knew DelVendo to be a Treasury agent. He told Sperlinga that two men "entered the DAV, utilizing strong-arm tactics, demanding that the machines inside the club be removed and be replaced with their own." He suggested that Sperlinga look into the matter. Sperlinga said he would do so and would be in touch with DelVendo. During the course of the conversation Sperlinga said, "Why do you come to me with a problem like that . . . Every time something happens it seems that somebody comes to me." The judge was warranted in submitting to the jury, as he did, the question whether this conversation occurred during the pendency of the conspiracy and in furtherance of its object. No argument is, or can be, made that by the evening of September 21 Sperlinga and Winter had abandoned the conspiracy manifested in the incident at the DAV that morning. See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. at 354-355. The jury could have found that Sperlinga's responses to what the defendant characterizes in his brief as DelVendo's attempt to frustrate the conspiracy was a temporizing effort "to protect, and hence to further, the purpose of the conspiracy." *Commonwealth* v. *Beckett*, 373 Mass. 329, 340 (1977). Cf. *Commonwealth* v. *Perry*, 248 Mass. 19, 26 (1924). See generally Marcus, The Prosecution and Defense of Criminal Conspiracy Cases 5-33 through 5-78 (1978). In context the significance of Sperlinga's statements and his credibility presented a jury question. *Commonwealth* v. *Beal*, 314 Mass. at 228-229. See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. at 308.

Since the admissibility against Winter of the first conversation supports the denial of the defendant's motions to strike, we need not consider the second conversation.[17] The

---

[17] At the second conversation Sperlinga said that he had looked into the matter and that "there wouldn't be any trouble there." As DelVendo left he said to Sperlinga, "You don't need me to tell you that I think you and Howie made a damn fool out of yourselves by going in and doing your own strong-arm work." In reply Sperlinga asked if DelVendo "was wired," that is, whether he was wearing a recording device.

defendant's motions to strike were acted on and exceptions were taken after both conversations were in evidence. The motions made no attempt to distinguish between them but addressed, without particularization, DelVendo's entire testimony.

(d) The conversation in mid September between Foster and Robinson, as a result of Foster's telephone call to Robinson, was properly submitted to the jury as evidence of the ongoing effort of the conspirators to install their pinball machines in Somerville clubs, using Robinson as an intermediary. The defendant obviously cannot and does not attack the admissibility of the conversation generally.[18] Rather, he points to an isolated portion of the conversation regarding Foster's plight in view of Winter's insistence on putting pinball machines in the clubs and characterizes it in his brief as "casual conversation" not in furtherance of the conspiracy. In the circumstances of this case, the judge was warranted in submitting the entire conversation to the jury so that they might appraise it as a whole. *Commonwealth* v. *Kiernan*, 348 Mass. 29, 59 (1964), cert. denied, 380 U.S. 913 (1965). *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. at 308. In any event, the jury could have found that this statement underscored for Robinson, who was being asked to act as intermediary, Winter's persistence in accomplishing the purpose of the conspiracy despite the qualms of a coconspirator.

3. *Claim of prosecutorial misconduct.* (a) A new trial is not required by the judge's refusal to grant a mistrial during Robinson's re-direct examination by the prosecutor. The mistrial was sought after the judge had sustained the defendant's objection when Robinson replied in the affirmative to the prosecutor's question whether he (Robinson) was receiving protection. The defendant did not move to strike the answer, nor did he accept the judge's offer at the ensuing bench conference to instruct the jury further. Indeed,

---

[18] The defendant's single sentence in his brief that "[i]t is significant that the defendant Foster was found not guilty" does not attempt to tell us what that significance might be and therefore calls for no discussion.

one of the defense counsel suggested that the question and answer be permitted to stand because "I would like to examine him about connections with so-called 'organized crime.' Who he needs protection from." The judge replied, "[T]wo wrongs don't make a right." See *Commonwealth v. Clifford,* 374 Mass. 293, 299 (1978); *Commonwealth v. O'Brien,* 377 Mass. 772, 778 (1979). The judge might have given specific cautionary instructions sua sponte in spite of the defendant's apparent position, which we find on this record untenable, that the effect of the question and answer was ineluctable. Cf. *Commonwealth v. Brown,* 376 Mass. 156, 165 (1978). Perhaps, however, the failure of the judge to take any further action was based on his appraisal that this question and answer did not loom sufficiently large so as to create a danger that they might affect the jury's deliberations. On the entire transcript, which we have examined, we believe that there was no such risk. In this connection we note that there was no request to strike, or objection to, Griffin's testimony — elicited on cross-examination by the defendant's counsel — that Griffin was receiving protection.

(b) The judge was within his discretion in denying the defendant's motion for a mistrial made at a bench conference precipitated by the prosecutor's question, "Did you threaten Mel-O-Tone"; an objection to the question was sustained so that it was never answered. The prosecutor asked the question in the course of exploring Winter's contacts with Mel-O-Tone, a vending machine company; Winter had denied any knowledge of the vending machine business. We need not consider the prosecutor's argument that the question was admissible in the context of this case; it was obviously within the judge's discretion to exclude it. *Commonwealth v. Fitzgerald,* 376 Mass. 402, 414 (1978). But, we give weight to the judge's choice to strike the question rather than declare a mistrial (*Commonwealth v. Barnett,* 371 Mass. 87, 91 [1976]), particularly in view of his careful instructions in his charge — amplified by instructions given before the opening — that where, as in this case,

an objection to a question was sustained and the answer did not come in, the jury "are to disregard that particular tiny segment of the trial. It has no place in your consideration."

(c) The defendant in his brief complains of various instances of misconduct by the prosecutor, particularly his persistence in and return to lines of inquiry from which the judge had excluded him. However, this resulted for the most part in unanswered questions to which objections were sustained. We do not condone such conduct, but the judge did not indicate that more was necessary to vindicate his authority (see *Sussman* v. *Commonwealth*, 374 Mass. 692, 695-699 [1978]), and the defendant was apparently satisfied that no more was needed. He did not press further for a mistrial or raise these matters in his motion for a new trial or otherwise until his brief in this court. In these circumstances, we do not deal with these matters further.

(d) The prosecutor's closing argument, read as a whole, does not call for a new trial. It seems to us properly to emphasize the evidence of the threats that the defendant made and the fear they engendered. The prosecutor characterized the case as "about fear" and as "about threats." From the evidence that neither Griffin nor Agostinelli knew Winter personally, and from their reaction to his name and presence, it was legitimate argument to ask the jury to infer that his name lent potency to the threats. From the incidents at the DAV and Somerset, as described by Griffin and Agostinelli, the jury were also justifiably asked to infer that Winter was not, as his direct testimony sought to show, an ordinary businessman and that this was not, as defense counsel argued, an attempt by Robinson and the other Commonwealth witnesses to frustrate a legitimate business undertaking.

The defendant invokes the "policy considerations underlying the exclusion of reputation" in a criminal case. The danger that a jury will reason from a propensity to commit crime to guilt of a particular charge has led to the exclusion of direct evidence, including reputation evidence, of the defendant's character. Note, . . . A Reevaluation of . . . the

Rule Excluding Evidence of Propensity to Commit Crime, 78 Harv. L. Rev. 426, 435-436 (1964). But here the jury were asked to infer guilt directly from fear and threats — not from reputation and a propensity for crime.[19]

The defendant finds a number of faults in various parts of the closing. We have examined them all and find that they do not vitiate the argument as a whole. We think it unnecessary to discuss them in detail. On the basis of our own examination of the transcript we agree with the trial judge's finding on the defendant's motion for a new trial: "In my opinion almost every point urged upon the jurors by the Commonwealth in its closing argument was either drawn directly from the evidence, or supported by it or reasonably inferred from it. With respect to those few instances where the Commonwealth engaged in what I would refer to as hyperbole . . ., it is my view that, in the overall context of the trial, including my general and curative instructions, the Commonwealth's remarks were not so prejudicial as to justify the granting of a new trial."

4. *Conclusion.* (a) In Commonwealth vs. Winter, No. 79-450, the judgment on indictment no. 77-4561 is affirmed; the sentence in 77-4563 is vacated.

(b) In Commonwealth vs. Sperlinga, No. 79-451, the judgments on both indictments (nos. 77-4566 & 77-4567) are vacated; the case is remanded to the Superior Court where the indictments shall be dismissed. *Commonwealth v. Harris*, 380 Mass. 917.

---

[19] The judge excluded direct evidence of reputation and cut short interrogation of Agostinelli on this matter. The court said, "[I]t probably opens up the door too far." We agree. We need not decide whether there may be circumstances in which such evidence is admissible, as the Commonwealth argues, citing cases under the Hobbs Act, 18 U.S.C. § 1951 (1976), and under the Extortionate Credit Transactions Act, 18 U.S.C. § 892 (1976).

We cannot agree that a mistrial was required when the prosecutor asked, "Do you know him [Winter] by reputation in the city" and was answered, "Yes." The court's corrective instruction was adequate; and, as can be seen from our discussion, it cannot be said that the question was asked in bad faith.

(c)  In Commonwealth vs. Winter, No. 79-871, the order denying the defendant's petition to stay execution (see note 1) is affirmed.

*So ordered.*