Commonwealth *v.* Lonardo.

COMMONWEALTH *vs.* CHARLES LONARDO.

No. 08-P-1154.

Essex. March 11, 2009. - July 1, 2009.

Present: McHugh, Green, & Fecteau, JJ.

*Conspiracy. Fraud. Insurance,* Fraud and concealment, Motor vehicle insurance.
*Evidence,* Conspiracy, Expert opinion. *Practice, Criminal,* Instructions to
jury, Argument by prosecutor.

At the trial of an indictment charging conspiracy, the circumstances of the
case presented sufficient evidence of knowledge and agreement to participate
in submitting false claims to an insurance company for a rational jury to
find the defendant's guilt beyond a reasonable doubt, even though each
factor by itself would not be enough to support conviction. [568-570]

At the trial of an indictment charging conspiracy, the judge did not err in
declining to instruct the jury that it would have to be in unanimous agree-
ment as to the particular coconspirator (or coconspirators) with whom the
defendant unlawfully had conspired, where the Commonwealth in its
indictment alleged that the defendant was involved with others in only one
conspiracy. [570-573]

At the trial of an indictment charging conspiracy to commit automotive insur-
ance fraud, the operation of fraudulent accident claim rings was within the
proper scope of expert testimony, and the Commonwealth's expert witness
did not link or relate her opinions to the particular defendants in the case;
moreover, although the witness should not have been allowed to define the
term "runner" without a proper foundation demonstrating that her defini-
tion was accepted in the relevant community, in the circumstances of the
case, no substantial risk of a miscarriage of justice arose from the admis-
sion of the testimony. [573-577]

There was no merit to a criminal defendant's claims of error in the prosecutor's
closing argument at trial. [577]

INDICTMENT found and returned in the Superior Court Depart-
ment on September 22, 2004.

The case was tried before *Howard J. Whitehead,* J.

*Robert S. Sinsheimer* (*Ronald J. Ranta* with him) for the
defendant.

*Kenneth E. Steinfield,* Assistant District Attorney, for the
Commonwealth.

FECTEAU, J. The defendant appeals from his conviction, after a jury trial in the Superior Court, of conspiracy to commit automotive insurance fraud, in violation of G. L. c. 266, § 111B. Specifically, he complains that (1) the judge erred when he denied the defendant's motion for a required finding of not guilty; (2) the judge should have given a specific unanimity instruction; (3) the Commonwealth's expert overstepped the proper bounds of expert testimony; and (4) there was prosecutorial error in the Commonwealth's closing argument. We affirm.

*Background.* We recite the facts in the light most favorable to the Commonwealth. Some facts are reserved for discussion of the issues. The defendant, an attorney with a busy personal injury practice, was accused of agreeing to participate in submitting fraudulent insurance claims. The law office was very busy, taking in fifty to seventy-five new clients every week. More than ninety-five percent of the cases involved "auto claims," and these clients were all "referred by someone." It seemed that only the defendant's office manager, Josefina Diaz, was allowed to speak to the people referring clients, and on Mondays and Wednesdays, she made cash payments to the "referrers," but only after she met with the defendant in his office. Diaz kept a notebook of the referrals that other people in the office were prohibited to open or examine.

Carlos Pinales participated in and staged collisions. Pinales became interested in referring clients to the defendant, and sometime prior to June 3, 2003, he approached the defendant alighting from his vehicle outside his law office. Pinales, who was unknown to the defendant, told the defendant that he could "bring him clients." Without further discussion, the defendant directed Pinales to Diaz, who arranged a referral payment of $150 per client that Pinales brought in.

On June 3, 2003, Pinales brought three men who allegedly were injured in an automobile accident (Efrain Palma, Melvin Morales, and Nelson Valdera) to the defendant's law office.[1] The three men met first with an intake secretary who brought them individually to an associate attorney, Deborah Cuomo, who worked for the defendant. Thereafter, consistent with the arrangement

---

[1]Pinales, Palma, and Morales later became cooperating Commonwealth witnesses and testified against the defendant.

made with Diaz, Pinales was paid $150 for each of these referrals.[2] The purported accident victims testified that they never met or spoke with the defendant. In addition, Pinales admitted that he never told the defendant that this or any other accident had been staged or was fraudulent, although he testified that it was in fact staged.

Pinales testified that every Monday for about three or four months in 2003, he went to the defendant's office around 4:30 or 5:00 P.M. to collect his money. Although Diaz would distribute the cash, payment always required the defendant's presence in the office. Sometimes, Pinales saw other friends of his who were involved in staging accidents also waiting at the defendant's law office.

In September of 2003, a woman died in a staged accident in Lawrence. This "accident" drew significant media attention, and by early 2004, the police had made a number of arrests. In either January or February, 2004, the police attempted to speak with the defendant at his law office; they were told to leave. The next day, the defendant called the Lawrence police department asking to speak to the chief of police, John Romero. Romero suggested that the defendant make an appointment, but the defendant insisted on seeing him immediately. After the defendant arrived at the police station, he asked Romero to accompany him on a walk. Romero insisted that they speak in his office and the defendant was reluctant, fearing the conversation would be "taped." Romero responded, "[Y]ou as an attorney know we can't do that."

In Romero's office, the defendant, who was nervous, said, "I know you are conducting an investigation of my office . . . . I know it is going on. . . . I didn't do anything wrong. . . . [W]hat if I was willing to close my practice and give up my license, would this stop[?]" When asked why he would do that, the defendant then said, "What if I told you I paid runners[?]"

1. *Sufficiency of the evidence.* The defendant was charged with conspiracy, a crime prohibited by G. L. c. 274, § 7. While no definition of conspiracy is provided by statute, a definition exists at common law: conspiracy is a "combination of two or

---

[2]Both Diaz and Cuomo were indicted for conspiracy with the defendant, but their motions for a required finding of not guilty were successful.

more persons, by some concerted action, to accomplish some criminal or unlawful purpose." *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 249 (1971), cert. denied, 407 Mass. 910, 914 (1972), quoting from *Commonwealth* v. *Hunt*, 4 Met. 111, 123 (1842).

The Commonwealth offered sufficient evidence to show the defendant's knowledge of, and agreement with, a fraudulent scheme. The Commonwealth concedes that there was no direct evidence from the defendant or from Pinales that they expressly had agreed to submit false insurance claims; indeed, there was evidence of only one meeting between the defendant and Pinales, during which Pinales said, "[H]e could bring [the defendant] clients." The defendant did not converse with Pinales, merely telling him to see Diaz, his office manager.

The Commonwealth is not limited, however, to direct evidence. "A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object . . . may be satisfactory proof of a conspiracy." *Commonwealth* v. *Pratt*, 407 Mass. 647, 653 (1990), quoting from *Commonwealth* v. *Smith*, 163 Mass. 411, 417-418 (1895). See *Commonwealth* v. *Nelson*, 370 Mass. 192, 196-197 (1976) (to conclude that "a person who joined a conspiracy to 'fix' a horse race, but who limited his participation to supplying the funds to be used in the scheme, and who scrupulously avoided acquiring knowledge of the method and means by which his coconspirators planned to alter the outcome of the race, could not be found guilty of conspiracy . . . is not in accordance with the existing law").

Particularly persuasive in support of the verdict was the evidence of what occurred following news concerning a "staged" accident that resulted in a fatality. The accident involved neither the defendant nor Pinales. Diaz, implicitly acting upon the defendant's instructions, called Pinales to say that he was to "come and get [his] clients" for whom he had not been paid, to take them "somewhere else," and not to bring any new clients.

The evidence of what transpired during a meeting between

the Lawrence police chief and the defendant also supports a conviction. The defendant, while maintaining his innocence, offered to give up his license to practice law in exchange for the police stopping an investigation regarding the defendant's office; when the chief asked why he would do so, the defendant said, "What if I told you I paid runners[?]" See *Commonwealth* v. *MacLeod*, 9 Mass. App. Ct. 934, 935 (1980) (offer to "make a deal" with police evidence of consciousness of guilt). While the defendant contends that this evidence suggests only consciousness of guilt about his breach of legal ethics, it was also probative of a guilty conscience about criminal acts because he likely would know that the police do not investigate violations of the rules of professional conduct.

In addition, there was evidence that (1) the defendant's secretaries were told that only Diaz was permitted to speak with Pinales and others who came into the office having "referred" clients; (2) Diaz kept a book that other office staff were forbidden to examine, in which she entered names of clients and those who had referred them, and in which she noted referral payments; (3) Pinales and others came for their payments only on certain assigned afternoons, and although he and others were paid by Diaz, she only could do so when the defendant was in the office and after checking with him; (4) the payments were always in cash and never by check; and (5) reports from the same chiropractic office regarding the three clients from the June 3, 2003, "accident" were sent to the defendant and described the effects of the accident on each in almost identical terms.

In our review for sufficiency of the evidence, we consider the evidence in the light most favorable to the Commonwealth along with any reasonable inferences drawn therefrom. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). While each factor by itself likely would not be enough to support conviction, our review for sufficiency leads us to conclude that these circumstances present sufficient evidence of knowledge and agreement to participate in submitting false claims to an insurance company for a rational jury to find the defendant's guilt beyond a reasonable doubt.

2. *Specific unanimity instruction.*[3] The defendant contends

_____

[3]Within this argument, the defendant contends also that the judge conflated

that the judge erroneously declined to instruct the jury that it would have to be in unanimous agreement as to the particular coconspirator (or coconspirators) with whom the defendant unlawfully had conspired. We find that there was no error, as the law does not require such an instruction.

Jury verdicts in criminal cases "must be unanimous," and in certain narrowly defined circumstances, a general unanimity instruction is insufficient "to ensure the requisite unanimity." *Commonwealth* v. *Santos*, 440 Mass. 281, 284 (2003). Generally, a defendant is entitled to a specific unanimity instruction only "when the Commonwealth has proceeded on 'alternate theories' " of guilt, defined as "separate, distinct, and essentially unrelated ways in which the same crime can be committed." *Id.* at 287-288. The law does not require that "the jury must be unanimous in their parsing of the details as to how a crime was committed." *Id.* at 289, citing *Commonwealth* v. *Laurore*, 437 Mass. 65, 82 (2002), and *Commonwealth* v. *Cyr*, 433 Mass. 617, 623 (2001).

While it may be necessary in some circumstances to give a specific unanimity instruction when the indictment is capable of incorporating multiple incidents or theories, the defendant's argument that multiple coconspirators are the legal equivalent of multiple theories is not a correct statement of the law. "No unanimity instruction was required because a conspiracy refers to a continuing course of conduct, rather than a succession of clearly detached incidents." *Commonwealth* v. *Albert*, 51 Mass. App. Ct. 377, 385 (2001), citing *Commonwealth* v. *Cerveny*, 387 Mass. 280, 288 (1982). Similarly, here, the Commonwealth alleged in a single indictment that the defendant was involved with Pinales and others in only one conspiracy: to commit insurance fraud. The bill of particulars first narrows the time period to coincide with the point in time from which Pinales brought Palma, Morales, and Valdera to the defendant and, second, refers only to the June 3, 2003, accident, specifically, as fraud-

the principles of joint venture in his instructions to the jury on the substantive law of conspiracy. Even if we were to consider the issue as adequately briefed under the provisions of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), which it was not, the judge's instructions were substantially similar to the defendant's own requested jury instructions on this point, and he did not preserve the issue by objecting to the instruction.

ulent. So long as the Commonwealth was able to prove that the defendant was involved with at least one other person in an unlawful agreement, a conspiracy existed.

Specifically, the Commonwealth alleged, particularized, and tried the defendant on the basis that he, and others in his office, were engaged in a plan to commit insurance fraud with Pinales. That Diaz and Cuomo were acquitted when the judge allowed their motions for a required finding of not guilty does not alter the analysis, because the theory of the government's case never was that the defendant was engaged with others on his staff to the exclusion of Pinales. There can be no risk that any juror concluded that the defendant conspired with Cuomo or Diaz, but not with Pinales, because the entire fraudulent scheme depended on Pinales.

Moreover, the judge instructed the jury that "[t]he Commonwealth must prove beyond a reasonable doubt that [the defendant] joined Ms. Cuomo, Ms. Diaz and/or Mr. Pinales in a plan collectively to commit motor vehicle insurance fraud, that is to say that he joined one or more of them in a plan, collectively to do those things which constituted motor vehicle insurance fraud. The plan that must be proven is not that each participant in the plan would do all of the acts that constitute motor vehicle insurance fraud but rather that the actions [of] all of them taken together would amount to a motor vehicle insurance fraud as I have defined it." This instruction illustrates that within a single conspiracy there may be subagreements; "[b]ecause one conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives. . . . If each stitch in that web were treated as a separate conspiracy, infinite bases for liability could be confected." *Commonwealth* v. *Winter*, 9 Mass. App. Ct. 512, 526 (1980), quoting from *United States* v. *Rodriguez*, 585 F.2d 1234, 1250 (5th Cir. 1978), aff'd, 450 U.S. 333 (1981).

An instruction on specific unanimity such as the defendant requests here would be contrary to the requirements of the law of conspiracy, in effect calling upon the prosecution to prove beyond a reasonable doubt and to the unanimous satisfaction of the jury not only the required elements of the offense, but each subagreement that may have existed. Indeed, as the judge instructed, the Commonwealth "is not required to prove that they agreed on

every detail of the plan . . . [or] that they ever actually met together or that they even knew the identity of each other" so long as "there was a joint plan among them and . . . the defendant adopted that plan, knowing that others were part of it." That Diaz and Cuomo were acquitted by judicial order does not alter the analysis, because there was only a single conspiracy alleged, even if it may have been dependent on a web of interconnected actions by and between others. "[W]hen the plot contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, and there is such continuous cooperation, it is a perversion of natural thought and of natural language to call such continuous cooperation a cinematographic series of distinct conspiracies, rather than to call it a single one." *Commonwealth* v. *Winter, supra* at 527, quoting from *United States* v. *Kissel*, 218 U.S. 601, 607 (1910).

As noted previously, there was no potential for jury confusion. The Commonwealth's case depended upon Pinales as the linchpin, without whom no clients would have been brought to the defendant's office and thus no unlawful purpose would have been accomplished. The principles of specific unanimity do not apply on the facts of this case.

3. *Expert testimony.* The defendant contends that Kimberly Giardina, the Commonwealth's first witness, improperly was allowed to give expert opinion testimony about "runners." He complains that she was permitted to opine on the defendant's guilt when "[s]he essentially said that everyone 'on the street' who dealt with a runner knew that the referred cases were staged," implying that the defendant would have known that Pinales was a runner, i.e., a person who brought fraudulent accident clients to lawyers.

First, although the defendant had filed a motion in limine concerning this testimony, which he renewed at the beginning of the witness's testimony, he did not preserve the issue for appellate review by a contemporaneous objection to the testimony. *Commonwealth* v. *Gaynor*, 73 Mass. App. Ct. 71, 76 (2008). The only objections that he made during her direct testimony about runners were to two nonresponsive answers. (Full quotations from the trial testimony of the witness, concerning "runners," are set forth in the Appendix to this opinion.) Therefore, we examine this claim under the standard for unpreserved error, to determine

whether the error, if any, created a substantial risk of a miscarriage of justice.

An expert witness clearly may not "offer an opinion as to the defendant's innocence or guilt" but may provide opinion testimony about general practices of fraudulent accident claim rings. See *Commonwealth* v. *Woods*, 419 Mass. 366, 375 (1995). As the defendant concedes, and upon examination of the expert's testimony, we are satisfied that her testimony about the operation of fraudulent accident claim rings, specifically, how they are organized and function, was within the proper scope of expert testimony. Moreover, her testimony did not link or relate her opinions to particular defendants herein.

Next, contrary to the defendant's specific complaints, examination of the transcript[4] reveals that the witness did not testify, as

---

[4]Her testimony on this subject began as follows. We set forth below, in part, and more fully in the Appendix, the transcript of the expert's testimony regarding the term "runner."

PROSECUTOR: "What do you understand the term 'runner' and how do you use that?"

WITNESS: "A runner is a person who actually stages the accident. He figures out how many people are going to be in the accident, what type of accident it's going to be, where it's going to take place . . . basically running the show in regards to a staged accident. And then after the accident has occurred, he would take the participants to the chiropractor and to the attorney."

THE COURT: "Does the term 'runner' also apply to people who bring legitimate claimants to chiropractors and law offices?"

WITNESS: "Not in my estimation."

THE COURT: "When you use the term, that's not what you mean?"

WITNESS: "No. He would not be working as a runner in that capacity."

PROSECUTOR: "So, how you use the term, is it possible for the same person on one case with the staged collision to act as a runner in which they've staged a collision and to act as someone who is just referring individuals with respect to a legitimate accident?"

WITNESS: "Yes."

PROSECUTOR: "So, it could be the same person, it's just what role they're playing on any given day?"

WITNESS: "Yes."

claimed by the defendant, (1) "that the term 'runner' was used 'on the street' to refer to persons who only staged accidents"[5]; (2) that "by definition all 'runners' are persons who stage accidents"[6]; or (3) "that such runners do not ever refer legitimate cases to attorneys."[7]

Nonetheless we think the witness should not have been allowed to define the term "runner" without a proper foundation demonstrating that her definition was accepted in the relevant community. See *Canavan's Case*, 432 Mass. 304, 313-315 (2000). See also Mass. G. Evid. § 702 (2008-2009). She personally equated the term "runner" with accident staging and testified that when a "runner" brought legitimate claims to a lawyer, he was not acting in his "runner" capacity. Without the proper foundation, the manner in which she described a "runner" was not a definition but rather a characterization which should have been allowed only if its probative value was not substantially outweighed by danger of unfair prejudice. *Id.* at § 402, 403. While not specifically argued, this description of the term "runner" was the only explanation given to the jury; we think the potential danger was that the jury would impose this characterization on others' use of the word. Its potential impact would be particularly troublesome if the jury had applied this characterization to the defendant's question to Romero, the Lawrence police chief and the last of the Commonwealth's witnesses, asking, "What if I told you I paid runners[?]"

A judge has broad discretion regarding the admission of expert testimony, and we review that decision only for abuse of discretion. *Commonwealth* v. *Patterson*, 445 Mass. 626, 639 (2005). The judge acts as a gatekeeper to all expert testimony, *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25-26 (1994), not just that expressing views on scientific matters. *Canavan's Case*, *supra* at 313.

---

[5]The witness used the phrase "on the street" to refer to "cases," not to runners.

[6]She testified that she defined the term "runner" as a person who stages accidents, not that her definition was the commonly understood meaning of the term.

[7]While by the witness's estimation, the term "runner" does not apply to people who bring legitimate claimants to chiropractors and to law offices, she admitted that "the same person on one case with the staged collision [could] act as a runner in which they've staged a collision and [could] act as someone who is just referring individuals with respect to a legitimate accident."

Commonwealth *v.* Lonardo.

We obviously cannot expect the judge to have foreseen how the testimony from several witnesses might intersect. We note, however, that the trial judge had particular experience with this expert and with Pinales from a prior trial. Indeed, the judge intervened during Pinales's testimony when he answered questions about how he got paid and as he began to describe the scene at the defendant's law office on Monday afternoons. Just when Pinales was about to start naming other people he recognized who were also in the waiting room, presuming they also were waiting for payment, counsel sought a sidebar conference. At sidebar, the judge was concerned about the direction of this testimony because Pinales did not have personal knowledge of why those other people were present at the law office. The judge did not permit Pinales to call them "runners" after the defendant's attorney expressly pointed to the expert's characterization of runners at the sidebar conference.[8] Moreover, we note that the prosecutor asserted in his closing that Pinales, whom "we all know is a runner, . . . stag[ed] accidents, and he was doing that for money."

While no one ever objected to the expert's characterization of

| | |
|---|---|
| [8] CUOMO'S COUNSEL: | "We're pre-objecting to that since it will probably come out quickly." |
| THE COURT: | "To which part?" |
| CUOMO'S COUNSEL: | "To the runners, the word." |
| THE COURT: | "I assume — is he aware that he cannot characterize on these other matters?" |
| PROSECUTOR: | "Is he aware at this second or was he aware before?" |
| THE COURT: | "He will be aware now, right?" |
| PROSECUTOR: | "I will lead him through that if he didn't have a problem with it." |
| THE COURT: | "Do you have a problem with him leading?" |
| DEFENDANT'S COUNSEL: | "No, I have a problem with that because he just testified that he brought some legitimate accidents and some staged accidents. Therefore, sometimes he was acting as a runner. Sometimes he was acting not as a runner given Ms. Giardina. We don't know what capacity these other individuals went, and he has no knowledge. That's the —." |

the term "runner," the transcript reveals that the judge was concerned about her testimony, interrupting her for clarification. Given the expert's idiosyncratic use of this term, in the exercise of the judge's discretion, a better course would have been to exclude it. Here, however, in the absence of objection, and because neither the expert in her testimony, nor the Commonwealth in its closing, connected or sought to impose the expert's characterization on the defendant's use of the term "runner," while we consider the question close, there was no risk of a miscarriage of justice.[9]

4. *Prosecutor's closing argument.* The defendant complains that the prosecutor improperly invited the jury to think that they could convict on less evidence than necessary by saying the "less said the better," and that his "cash cow" extrapolation was overly prejudicial to the defendant even though the judge immediately gave a direct and forceful curative instruction. We disagree.

As to the first claim, the defendant's failure to provide adequate argument and authority need not detain us longer than to simply observe that when the prosecutor made reference to the "less said the better," he merely was expressing his theory, based on the evidence, that the defendant sought to maintain deniability by avoiding discussion among him and his coconspirators. There was no suggestion on the prosecutor's part that the jury could convict on less than adequate evidence.

As far as the "cash cow" extrapolation argument is concerned, the jury is presumed to follow judicial instructions, and here, the judge's prompt, direct, and forceful curative instructions were sufficient to address this particular occasion of prosecutorial overreaching. There was no error.

*Judgment affirmed.*

APPENDIX.

The following, in pertinent part, are quotations from the transcript of the expert's testimony concerning her characterization of the term "runner."

PROSECUTOR:     "What do you understand the term 'runner' and how do you use that?"

---

[9]Indeed, the point is sufficiently subtle that the defendant has not argued it in his brief, further suggesting that it was unlikely to have influenced the jury.

WITNESS:     "A runner is a person who actually stages the accident. He figures out how many people are going to be in the accident, what type of accident it's going to be, where it's going to take place, what time — basically running the show in regards to a staged accident. And after the accident has occurred, he would take the participants to the chiropractor and to the attorney."

THE COURT:     "Does the term 'runner' also apply to people who bring legitimate claimants to chiropractors and law offices?"

WITNESS:     "Not in my estimation."

THE COURT:     "When you use the term, that's not what you mean?"

WITNESS:     "No. He would not be working as a runner in that capacity."

PROSECUTOR:     "So, how you use the term, is it possible for the same person on one case with the staged collision to act as a runner in which they've staged a collision and to act as someone who is just referring individuals with respect to a legitimate accident?"

WITNESS:     "Yes."

PROSECUTOR:     "So, it could be the same person, it's just what role they're playing on any given day?"

WITNESS:     "Yes."

PROSECUTOR:     "How many runners have you spoken to using how you define the term 'runner?' "

WITNESS:     "How I define it? That would be one main runner, and we've spoken to several —."

Diaz's trial counsel first objects, which, when coupled with the next objection, and considering the response given to this short line of questions, clearly was being made on responsiveness grounds. The prosecutor then began a new line of examination, calling for explanation of the various ways that accidents can be "staged," how the claim is submitted, and how the runner is paid.

On cross-examination, trial counsel for the defendant brought out the following additional testimony about runners and Pinales:

DEFENDANT'S COUNSEL:     "Carlos Pinales told you that he brought in legitimate cases, as well, didn't he? In your interview with him?"

WITNESS:     "Yes."

DEFENDANT'S COUNSEL:     "But you didn't — you indicated, you called him a runner, correct?"

WITNESS:     "Yes."

Commonwealth *v.* Lonardo.

| | |
|---|---|
| DEFENDANT'S COUNSEL: | "Carlos Pinales is a runner, correct?" |
| WITNESS: | "Yes." |
| DEFENDANT'S COUNSEL: | "He told you that he brought in legitimate cases to get referral fees, correct?" |
| WITNESS: | "Yes." |
| DEFENDANT'S COUNSEL: | "But you indicate that a runner is someone that does not bring in legitimate cases?" |
| WITNESS: | "If they're working in that capacity." |
| DEFENDANT'S COUNSEL: | "So there are times they can work — so, when you use the term 'runner,' it is when they're working in the capacity as someone who's staging an accident, correct?" |
| WITNESS: | "Yes." |
| DEFENDANT'S COUNSEL: | "When they are out on the street and people come up to them and say, 'Hey, I've been in an accident. Can you help me and refer me to someone,' and he brings in legitimate accident cases, he's then not working as a runner, correct?" |
| WITNESS: | "Correct." |
| THE COURT: | "Is there a word in the business for that person?" |
| WITNESS: | "Ambulance chaser." |
| THE COURT: | "Ambulance chaser?" |
| WITNESS: | "Referral person. I don't know." |
| DEFENDANT'S COUNSEL: | "So, Mr. Pinales, you knew, brought in legitimate cases, as well?" |
| WITNESS: | "Yes." |