NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1955                                    Appeals Court

COMMONWEALTH  vs.  LEONARD DEGNAN.

No. 14-P-1955.

Essex.     December 1, 2016. - March 30, 2017.

Present:  Cypher, Maldonado, & Blake, JJ.


Municipal Corporations, Officers and employees. Solicitation to
    Commit Felony. Bribery. Conspiracy. Fraud. Evidence,
    Bribe, Conspiracy, Fraud. Practice, Criminal, Duplicative
    convictions, Argument by prosecutor.



Indictments found and returned in the Superior Court
Department on September 11, 2012.

    The cases were tried before Douglas H. Wilkins, J.


    David A.F. Lewis for the defendant.
    Philip A. Mallard, Assistant District Attorney, for the
Commonwealth.


    BLAKE, J.  Following the election of William Lantigua as

mayor of Lawrence (city) in 2009, the defendant, Leonard Degnan,

served as his chief of staff.  During the defendant's tenure in

that position, he secured the donation of a trash truck from the

city's waste services provider to a city in the Dominican

Republic.  The donation request took place during a meeting in which the defendant told the provider that the mayor's office "had the ability to rip up" the provider's contract with the city.  Following the donation, the city took no action to void or modify the contract.

In 2012, a grand jury returned several indictments charging the defendant with bribery and other crimes related to the trash truck donation.  A 2014 jury trial resulted in convictions of soliciting a bribe, soliciting a gratuity, conspiracy to solicit a bribe, and unlawful use of an official position with fraudulent intent.[1]  On appeal, the defendant claims that the Commonwealth presented insufficient evidence to support the convictions, and that errors in the prosecutor's closing argument created a substantial risk of a miscarriage of justice.  With the exception of the conviction of soliciting a gratuity under G. L. c. 268A, § 3(b), which we vacate as duplicative of the bribery conviction, we affirm the defendant's convictions.

Background.  In the light most favorable to the Commonwealth, Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), the jury could have found the following facts.

1.  City's waste removal contract.  Allied Waste (Allied) is a waste hauling company that holds multiple municipal

---

[1] The jury acquitted the defendant of one count of extortion.

contracts, private contracts, and commercial accounts.  In 2009, Stanley Walczak was a general manager at Allied responsible for the negotiation of municipal contracts with the city, among other duties.  In September, 2009, prior to Lantigua's election, Walczak and the city renegotiated a new $6.4 million, three-year contract to commence on October 1, 2009, with two additional option years.  The new contract was significantly different from the prior, as it converted the city to an automated collection system with limited barrels per household.  To fulfil the contract, Allied was required to purchase new barrels and new side-loading trucks at a cost of $2 million to $3 million. Despite the significant financial investment required, the parties expected that the reduced manpower needed, as well as the limited trash collection per household, would result in savings over the long term.[2]  As an additional cost-saving measure, the new contract also eliminated bulk item pickup. During the early implementation of the new contract, some of the city's residents protested the reduced services.

   2.  <u>Connection to the Dominican Republic</u>.  In November, 2009, the city's voters elected Lantigua, who was the first mayor originally from the Dominican Republic.  More than one-

---

[2] By limiting the collection barrels per household, Allied and the city hoped to decrease the trash and increase the recycling collected, which would, in turn, reduce Allied's trash disposal fees and increase its revenue from the sale of the recycled material.

third of the city's eligible voters are from the Dominican Republic, with a significant number of those from the Dominican city of Tenares.  Shortly after the election, Lantigua and the defendant met with the mayor of Tenares while they were vacationing in the Dominican Republic.

3.  Solicitation of the donation.  After his return from the Dominican Republic, the defendant commenced work in the new administration.  He directed the everyday operations of the city, acted as its "finance director," and oversaw the city's contracts, including its contract with Allied, all in close connection with the mayor.  Vendors, including Walczak, knew that the "mayor's office ha[d] a lot of clout" and "a lot of say" in the renewal and awarding of contracts and, for that reason, they knew that it was in their interest to be responsive to the mayor's office.

In December, 2009, Frank McCann, the head of the city's department of public works, telephoned Walczak to set up a meeting with Walczak and the defendant.  At that point, Walczak had known McCann for about eleven years and had worked with him as the city's contact person on its trash contracts.  During the call, McCann informed Walczak that, at the meeting, the defendant was going to ask that Allied donate one or two trash trucks.

The meeting took place later that month at the defendant's insurance office.[3]  According to Walczak, it proceeded as follows.  From behind his desk, with McCann and Walczak seated in front of him, the defendant immediately launched into a hostile attack about the new trash contract.  He stated that both he and the mayor were not happy with the contract, and that he "could not believe" that the previous administration had signed such a "way overpriced" contract.  Continuing in a confrontational tone, the defendant emphasized that the cost of the contract had been significantly increased from the previous one, but provided fewer services, and that he "didn't believe it would work in the city of Lawrence."  The defendant told Walczak that "he was the right hand of the mayor" and "could find a lot of other companies to come in to do it a lot cheaper."  Finally, the defendant said that he and the mayor "had the ability to rip up the contract, not honor it."

About fifteen minutes into the meeting, while Walczak was attempting to explain how the contract had come into existence, the defendant cut him off and told him that the defendant and the mayor were "going to give [Allied] a chance . . . even though [the city] could terminate the contract, they were going to give [Allied] the opportunity to work with [them]."  The

---

[3] The defendant owned an insurance business and had worked there prior to becoming chief of staff.

tenor of the meeting then immediately changed. The defendant told Walczak that "[he] and the mayor would be very happy" and "it would go a long way if [Allied] could donate . . . a couple of trucks" to the city's sister city of Tenares, because it is very poor.

Walczak never before had been asked for such a donation. Feeling threatened, he believed that if he could not produce a trash truck, the mayor and the defendant would void the contract. Likewise, he thought that if he went to the police about the defendant's threat, the contract would be voided. Thinking of his employees, the value of the relatively new contract, the precarious financial position of the city,[4] and the significant investment Allied had already made, Walczak decided to "see if there was . . . a way to make this all work." He told the defendant that he would "run the request up the flagpole" and "get back to them." As he left the office, Walczak knew the situation was not good, but he did not want "to get into a battle with a municipality[,] [a battle] [y]ou never win."

---

[4] Walczak was concerned about the city's going into bankruptcy and receivership. When Lantigua took office, the city had an approximate $25 million budget deficit.

McCann confirmed Walczak's description of the meeting.[5] According to McCann, the defendant initially impressed upon Walczak how important and tough he could be so that he and the mayor would get what they wanted -- the donation of a trash truck. McCann also noted that "[t]here was no please in [the donation request]," and the defendant framed it in such a way as to let Walczak figure out the meaning of the request rather than stating it directly.[6]

4. Resulting donation. After the meeting, Walczak telephoned his maintenance manager, who reported that Allied had a trash truck, which was going to be auctioned off for an amount likely between $1,500 and $2,500, available for donation. Walczak then sought approval for the donation from his superiors in an electronic mail message dated December 16, 2009. Walczak did not disclose that the defendant had threatened him for a trash truck donation, but rather cast his request solely as one to secure the good will of the new administration. In doing so,

---

[5] McCann's testimony at trial was offered by way of his prior grand jury testimony, which was read into the record. In earlier portions of his grand jury testimony, McCann denied that the defendant took part in the conversation with Walczak in which the request for a trash truck was made. McCann later changed his testimony and confirmed Walczak's version of events.

[6] The defendant did not testify at trial, but his grand jury testimony was read into the record. In that testimony, he acknowledged that the mayor had told him that he wanted a trash truck and that "[he (the defendant)] may have" discussed the donation with Walczak and McCann in a meeting.

he thought that he "could take care of it, get it done and over with by . . . donating an old truck."  Walczak obtained the requisite approval within a day.

Over the course of the next several weeks, Allied prepared the truck for donation at its own expense, including giving the truck a new paint job and new tires at the mayor's request. Thereafter, Lantigua, representatives of Allied, and the mayor of Tenares all posed for a photograph in front of a truck similar to the one being donated.[7]  Another Lawrence businessman, Francis Coady, then agreed to tow the truck to a port in New Jersey at no charge for shipment to Tenares.[8]  After the truck successfully arrived in Tenares, the city made no attempt to cancel or modify Allied's contract, nor did it complain about its cost.  Lantigua also supported Allied when issues arose in the city council regarding trash collection.

Discussion.  1.  Sufficiency of the evidence of bribery. On the facts present here, a bribery conviction in violation of G. L. c. 268A, § 2(b), requires proof that a "municipal employee . . . or a person selected to be such an employee . . . directly or indirectly . . . corruptly . . . solicit[ed] . . . anything

---

[7] Preparations were still being made to the donated truck when the picture was taken.

[8] Coady testified that the defendant called him about towing the truck, and that he essentially offered to do the job at no cost if the defendant could wait about a month.

of value for . . . any other person or entity, in return for . . . being influenced in his performance of any official act or any act within his official responsibility."[9]

Here, the facts establish that, at all relevant times, the defendant was a municipal employee or a person selected to be such an employee, who solicited a trash truck (something of value) for either the mayor (any other person) or the city of Tenares (an entity).  At issue on appeal is the remaining portion of the statute, which requires proof of the defendant's corrupt intent and limits the influenced action to the sphere of the defendant's "official" duties.  In seeking guidance on the meaning of these parts of the statute, because G. L. c. 268A, § 2, tracks a cognate Federal statute, we may look to the relevant Federal case law, in addition to our own.  See Scaccia v. State Ethics Commn., 431 Mass. 351, 354-355 (2000);

---

[9] General Laws c. 268A, § 2(b), inserted by St. 1962, c. 779, § 1, provides:  "Whoever, being a . . . municipal employee . . . or a person selected to be such an employee . . . directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself or for any other person or entity, in return for (1) being influenced in his performance of any official act or any act within his official responsibility . . . shall be punished."

While the statute includes the terms "asks, demands, exacts . . . [and] seeks," in addition to "solicits," given the evidence here, and for the sake of clarity, we shall limit ourselves to that term.

Commonwealth v. Dutney, 4 Mass. App. Ct. 363, 376-377 & n.16 (1976).

In Scaccia, the Supreme Judicial Court described bribery under G. L. c. 268A, § 2, as a "quid pro quo" or "an exchange, involving a two-way nexus." Scaccia, supra at 356. See United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 404-405 (1999).[10] The specific intent to enter into an unlawful quid pro quo is, essentially, the corrupt intent required by the statute. United States v. Alfisi, 308 F.3d 144, 149 (2d Cir. 2002) ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement . . ."). In other words, the statute is violated when an official solicits a bribe, knowing that it will be given for the purpose of inducing him to violate his official duty. See United States v. Valle, 538 F.3d 341, 345-346 (5th Cir. 2008). Whether, upon receipt of the bribe, the defendant actually is influenced in the performance of his official duties is not required to prove criminality. See Evans v. United States, 504 U.S. 255, 268 (1992) ("[The] fulfillment of the quid pro quo is not an element of the offense"); Valle, supra at 346 ("[T]he statute [is] violated when an official [takes] the bribe, knowing that it was given

---

[10] By contrast, because a conviction of soliciting a gratuity under G. L. c. 268A, § 3, requires no proof of a corrupt intent on the part of the defendant, it has been described as a "one-way nexus." Scaccia, supra at 356.

for the purpose of inducing him to violate his official duty, whether or not he actually intended to follow through with the violation").  In determining whether the defendant agreed to be influenced in the quid pro quo exchange, "[t]he jury may consider a broad range of pertinent evidence, including the nature of the transaction."  McDonnell v. United States, 136 S. Ct. 2355, 2371 (2016).

Here, the evidence permitted the jury to infer the defendant's corrupt intent.  At the meeting with Walczak and McCann, the defendant made abundantly clear that the purpose of the donation was to keep the trash contract intact.  Even though the defendant did not spell out the quid pro quo directly, his approach was not subtle.  By both Walczak's and McCann's accounts, the defendant made clear, through his threatening and hostile manner, the repercussions of failing to provide the requested donation.  From this evidence, the jury could infer that the defendant solicited the trash truck in exchange for not voiding the contract -- an unlawful quid pro quo.[11]

The other portion of the statute at issue limits the influence exerted to an "official act or any act within [the defendant's] official responsibility."  G. L. c. 268A,

---

[11] The defendant's challenge of Walczak's authority to donate the truck is baseless and irrelevant, as it is the defendant's -- not Walczak's -- intent, conduct, and authority that are at issue.

§ 2(b)(1). Thus, the bribe must be in exchange for influence only within the official realm at the defendant's disposal. General Laws c. 268A, which concerns the conduct of public officials and employees, defines an "official act" as "any decision or action in a particular matter or in the enactment of legislation," G. L. c. 268A, § 1(h), inserted by St. 1962, c. 779, § 1; an "official responsibility" is defined as "the direct administrative or operating authority, whether intermediate or final, and either exercisable alone or with others, and whether personal or through subordinates, to approve, disapprove or otherwise direct agency action," G. L. c. 268A, § 1(i), inserted by St. 1962, c. 779, § 1.

The decision whether to terminate a large municipal contract, such as the trash contract, is indisputably an official act. As an intermediate official, the defendant did not hold the authority, himself, to terminate the contract. Nevertheless, the Commonwealth presented sufficient evidence that the contract was within the defendant's official responsibility. The defendant testified that his duties included working with vendors and advising the mayor on large contracts, such as the trash contract. Thus, at the very least, he had intermediate operating authority with respect to the contract, exercisable with another (the mayor), to direct agency action. Put another way, the defendant had the requisite

authority to be able to make good on his agreement to influence the mayor's treatment of the trash contract.

On appeal, the defendant nevertheless argues that the Commonwealth did not meet its burden because it presented no evidence that the contract, which was binding and enforceable, could be terminated.  In other words, the defendant argues that the contract was not subject to official action or influence. The contract, itself, however, belies that argument.  It was admitted in evidence and includes a convenience clause permitting the city to terminate the contract without providing a reason.[12]  This evidence, in combination with testimony that the defendant intended to void the contract if the mayor did not receive the trash truck donation, establishes that the contract, itself, was not a bar to the defendant's commission of bribery.[13]

---

[12] The convenience clause provides:  "The City may terminate this Agreement at any time by giving written notice to the Contractor of such termination and specifying the effective date of such termination."

[13] Likewise unavailing is the defendant's claim that city could not legally invoke the convenience clause as retribution for the failure to pay a bribe.  Regardless of the legality, or the outcome of any later legal battle, the immediate effect of invoking the clause would be termination of the Allied contract, as contemplated by the defendant's bribery scheme.

The judge properly denied the defendant's motion for a required finding of not guilty on the G. L. c. 268A, § 2(b), bribery conviction.[14]

2. Duplicative convictions. We vacate as duplicative the defendant's conviction of soliciting a gratuity under G. L. c. 268A, § 3(b). The elements of that statute are essentially a subset of those of G. L. c. 268A, § 2(b), missing only the element of corrupt intent.[15] See Commonwealth v. Vazquez, 69 Mass. App. Ct. 622, 627 (2007) ("For a violation of G. L. c. 268A, § 3[b], it is enough that the defendant requested or received something of substantial value for or because of an official act or an act within his official responsibility"). For that reason, as this court and the Supreme Judicial Court have recognized, one is a lesser included offense of the other.

_____

[14] The defendant argues that his telephone call to Coady did not provide evidence to support conviction on any of the charged offenses. He does not, however, challenge its admission on the basis of relevance. Regardless, we observe that the telephone call was not the central piece of the Commonwealth's evidence, and that the jury were entitled to assign to it the weight they deemed appropriate.

[15] General Laws c. 268A, § 3(b), as amended by St. 2009, c. 28, § 62, provides: "Whoever knowingly, being a present . . . municipal employee . . . or person selected to be such an employee . . . , otherwise than as provided by law for the proper discharge of official duty, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of substantial value: (i) for himself for or because of any official act or act within his official responsibility performed or to be performed by him; or (ii) to influence, or attempt to influence, him in an official act taken . . . shall be punished."

See Scaccia, 431 Mass. at 356 ("A [G. L. c. 268A, § 3,] gratuity violation is, essentially, a lesser included offense of [G. L. c. 268A, § 2,] bribery"); Dutney, 4 Mass. App. Ct. at 376-377 (same).  See generally Commonwealth v. Porro, 458 Mass. 526, 531 (2010) ("[A] lesser included offense is one whose elements are a subset of the elements of the [greater] charged offense").  Where a defendant is convicted of both the greater and lesser offenses, the conviction of the lesser offense must be dismissed as duplicative.  See Commonwealth v. Vick, 454 Mass. 418, 431-432 (2009); Commonwealth v. Guaman, 90 Mass. App. Ct. 36, 47 (2016).[16]

3.  Remaining claims.  The defendant's remaining claims require little discussion.

a.  Sufficiency of the evidence of conspiracy to solicit a bribe.  Because the Commonwealth presented sufficient circumstantial evidence of an agreement between the defendant and the mayor to commit the crime of bribery, the Commonwealth met its burden to prove the crime of conspiracy.  See generally Commonwealth v. Cerveny, 387 Mass. 280, 288 (1982); Commonwealth v. Lonardo, 74 Mass. App. Ct. 566, 569 (2009).

---

[16] We need not remand for resentencing because the sentence imposed on the lesser included offense was concurrent with the sentences imposed for the convictions of conspiracy and unlawful use of an official position.  See, e.g., Commonwealth v. Johnson, 461 Mass. 44, 54 n.12 (2011).

b.  Closing argument.  None of the five unobjected-to statements the defendant challenges was error, much less the cause of a substantial risk of a miscarriage of justice.  See Commonwealth v. Smith, 460 Mass. 385, 398 (2011).  Rather, the statements were confined to the evidence, including the reasonable inferences to be drawn therefrom.  See Commonwealth v. Kater, 432 Mass. 404, 422 & n.14 (2000).  More specifically, the evidence supported the prosecutor's characterization of the defendant as the "captain" of the Lantigua "team."  His remark that this case was not about a trash truck, but about the "cloud of corruption" that "hovers" or "hangs" over the truck was a fair summary of the case.  In responding to the defense's suggestion that the jury consider why the defendant was the only one on trial, the prosecutor's statement that it "[was] not their time" was a fair response.  Nor did the prosecutor misstate evidence of the defendant's telephone call to Coady. Finally, the evidence supported the prosecutor's suggested inference, based on the timing of events, that the conspiracy may have formed on the vacation to the Dominican Republic that the defendant took with Lantigua immediately after he won the election and had become friendly with the mayor of Tenares.

Conclusion.  The judgment of conviction of solicitation of a gratuity, in violation of G. L. c. 268A, § 3(b), is vacated,

the verdict is set aside, and that indictment is dismissed.  The remaining convictions are affirmed.

<u>So ordered</u>.